RANDY S. GROSSMAN
Acting United States Attorney
SHAUNA R. PREWITT
Assistant United States Attorney
Illinois State Bar No. 6300593
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7937
Email: shauna.prewitt@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SERGIO SEVILLA AVILA,<br><br>Defendant. | Case No.: 21-CR-0578-W<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)** |

**Introduction**

Defendant SERGIO SEVILLA AVILA has filed a motion asking this Court to order his immediate release under 18 U.S.C. § 3582(c)(1)(A) because of his "serious health problems," recent hospitalization, and "conditions of confinement at GEO." ECF No. 45 at 9-12. The Court should deny the motion.

**Factual Background**

On January 26, 2021, SEVILLA AVILA applied for admission to the United States from Mexico via the San Ysidro, California Port of Entry as the sole occupant and registered owner of a Ford Ranger (the vehicle). ECF No. 33 (PSR) ¶¶ 5, 9. During primary inspection, SEVILLA AVILA presented his Lawful Permanent Resident (LPR) card and stated that he was going to San Diego. *Id.* A canine alerted to the vehicle, and SEVILLA AVILA was referred to secondary inspection. *Id.*

In secondary, a total of 32 packages of methamphetamine, weighing approximately 15.16 kilograms, were recovered from the vehicle's real panels. PSR ¶ 5. A subsequent drug laboratory analysis reflected that the packages contained methamphetamine, which was 98 percent pure. *Id.*

Post-arrest, SEVILLA AVILA invoked. PSR ¶ 5. Approximately $433 was seized. *Id.* ¶ 7.

On February 26, 2021, SEVILLA AVILA was charged by Information with importation of methamphetamine in violation of 21 U.S.C. §§ 952 and 960. PSR ¶ 1. He pled not guilty.

On May 3, 2021, SEVILLA AVILA pled guilty to a Superseding Information charging him with conspiracy to smuggle bulk cash in violation of 18 U.S.C. § 371. PSR ¶¶ 2-3. In his plea agreement, SEVILLA AVILA admitted that he had provided his vehicle to others to be loaded with reportable currency on approximately four or five occasions between January 4, 2021, and January 26, 2021. *Id.* ¶ 16. He also admitted that he was paid for those crossings. *Id.* Additionally, SEVILLA AVILA stated that, on the date of his arrest, he intended to deliver the vehicle to National City in order for it to be loaded with reportable currency. *Id.* ¶ 17.

In advance of sentencing, SEVILLA AVILA submitted voluminous under-seal medical records outlining, among others, his "heart arrhythmia which [] resulted in two hospitalizations while in custody," "botched colon surgery," numerous injuries, and his impaired hearing and vision issues. ECF No. 37 at 1, 3. SEVILLA AVILA also provided information about his conditions of confinement, including that he was often made to "sit in his own fecal matter." *Id.* at 3.

The presentence report similarly outlined SEVILLA AVILA's health history, including his history of surgeries, diabetes, high blood pressure, and heart arrythmia. PSR ¶¶ 53-63. Nevertheless, the Probation Officer recommended a custodial sentence, noting that:

- "The Bureau of Prisons (BOP) has facilities and resources to address the defendant's physical ailments";
- "[W]hile he was at the Western Region Detention Facility, it was determined that he had no work restrictions"; and,
- "[T]he defendant was still able to commit this offense and while his conditions are serious and numerous, they should not be a mechanism to excuse his criminal actions and culpability in this offense."

*Id.* ¶ 107.

After hearing arguments by both parties at the sentencing hearing scheduled for July 26, 2021, SEVILLA AVILA was sentenced by the Court to 10 months in custody. ECF Nos. 42-43.

To date, SEVILLA AVILA has served approximately 9 months of his 10-month sentence. He is currently incarcerated at GEO and is scheduled to be released in late November 2021.

## Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in extraordinary circumstances, grant a motion to reduce a defendant's sentence. A court may reduce the defendant's term of imprisonment "after considering the factors set forth in section 3553(a)" if the Court finds that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).[1] As the movant, SEVILLA AVILA bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

---

[1] The Court also must find that "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or that 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* The United States agrees with the SEVILLA AVILA that he is excused from meeting the statutory exhaustion requirement here because he is not currently in BOP custody.

In the most recent Guidelines Manual, the Sentencing Commission issued a policy statement for reductions of sentences under § 3582(c)(1)(A). It provides that a court may reduce a sentence after considering the § 3553(a) factors if it finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an application note defining the criteria that qualify as "extraordinary and compelling." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Third, age may qualify if the defendant (1) is at least 65 years old; (2) is experiencing "a serious deterioration in physical or mental health because of the aging process"; and (3) has served at least 10 years or 75% of the sentence, whichever is less. U.S.S.G. § 1B1.13, cmt. n.1(B). Fourth, certain family circumstances may be extraordinary and compelling. U.S.S.G. § 1B1.13, cmt. n.1(C). Lastly, in a broad "catch-all" provision, the application note recognizes the possibility that the BOP Director could identify an extraordinary and compelling reason "other than, or in combination with, the reasons described" above. U.S.S.G. § 1B1.13, cmt. n.1(D).

## Discussion

This Court should deny SEVILLA AVILA's motion because he does not identify "extraordinary and compelling reasons" justifying the dramatic relief of a sentence reduction. Defendant does not have "a serious physical or medical condition" within the

meaning of the Sentencing Commission's policy statement or otherwise present "extraordinary and compelling reasons" justifying his immediate release, and he also does not satisfy his burden to show that release is warranted under the § 3553(a) factors.

**I. SEVILLA AVILA does not meet the threshold requirement of having "extraordinary and compelling reasons" required for relief under the statute.**

Under 18 U.S.C. § 3582(c)(1)(A), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement defines "extraordinary and compelling" to include specific categories of medical conditions and other circumstances. U.S.S.G. § 1B1.13, cmt. n.1(A). Yet SEVILLA AVILA offers none of these circumstances in the motion.

    A.    After *Aruda*, this Court is not strictly bound by the Sentencing Commission's current policy statement, but it still serves as an important framework for the Court's exercise of discretion.

Whether the policy statement in U.S.S.G. § 1B1.13 is binding is "a difficult legal question" that has "sharply divided the courts." *United States v. Ruffin*, 978 F.3d 1000, 1006 (6th Cir. 2020). The circuits are split. One has held that "1B1.13 is an applicable policy statement for all Section 3582(c)(1)(A) motions" and courts have no discretion "to develop 'other reasons' that might justify a reduction in a defendant's sentence." *United States v. Bryant*, 996 F.3d 1243, 1248 (11th Cir. 2021). Others disagree. Following the second group's lead, the Ninth Circuit has held that the policy statement is not binding. *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam). Under *Aruda*'s rationale, § 1B1.13 is technically not "applicable" within the meaning of § 3582(c)(1)(A), because it was issued when only the BOP Director could file motions for compassionate release, before the First Step Act opened up the process to inmates. *Id.* at 800-802.

Importantly, *Aruda* did not express qualms about the *substance* of § 1B1.13's definition of "extraordinary and compelling." Nor did the Ninth Circuit question the Sentencing Commission's standing as the resident expert and the proper policymaker on

this subject. *See* 28 U.S.C. § 994(t) (instructing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *see also* 28 U.S.C. § 994(o) ("In fulfilling its duties and exercising its powers, the Commission shall consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system"); 28 U.S.C. § 994(a)(2) (delegating to Commission power to create "policy statements regarding application of the guidelines or any other aspect of sentencing"). Sitting as "an expert body located within the Judicial Branch," the Commission is charged with the "intricate task of formulating" sentencing policy, *Mistretta v. United States*, 488 U.S. 361, 412 (1989), in order "to permit Federal courts to meet their responsibilities" with respect to sentencing. 28 U.S.C. § 995(a)(22).

Far from criticizing the wisdom of the existing policy, *Aruda*'s holding was instead wrought by bureaucratic happenstance, namely, the inability of the Sentencing Commission to update § 1B1.13 due to its current lack of a quorum. *Aruda*, 993 F.3d at 800 n.1. Since Congress "surely could not have known, and did not intend, that . . . the Sentencing Commission would fail altogether to issue a new policy statement," *United States v. McGee*, 992 F.3d 1035, 1050 n.5 (10th Cir. 2021), this Court should resist Defendant's invitation to "invent [its] own policies about compassionate release." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (Easterbrook, J.). That would be inconsistent with Congressional design. As the Ninth Circuit and its sister circuits have emphasized, § 1B1.13 continues to "inform a district court's discretion[.]" *Aruda*, 993 F.3d at 802. Because it remains "a working definition of 'extraordinary and compelling reasons[,]' a [court] who strikes off on a different path risks" abusing its discretion. *Gunn*, at 1180; *see United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("§ 1B1.13 informs our analysis"); *United States v. McCoy*, 981 F.3d 271, 282 n.7 (4th Cir. 2020) ("it remains helpful guidance"); *see also Aruda*, at 802 (citing *Gunn*'s warning against striking off on different path).

Accordingly, the Court's analysis of whether an inmate's reasons are truly extraordinary and compelling should begin with the Sentencing Commission's current

policy statement. Although the Court is not limited by the policy statement, and has the freedom to consider additional factors, its discretion should still hover close to § 1B1.13. The following reasons explain why.

*First*, the history of § 1B1.13 shows that the Sentencing Commission drafted the current policy statement to maximize clarity on what "extraordinary and compelling" means. The Commission first promulgated § 1B1.13 in 2006, when it was little more than a general proposition that the BOP Director could determine whether "a particular case warrants a reduction for extraordinary and compelling reasons[.]" U.S.S.G. § 1B1.13, cmt. n.1(A) (2006). After fleshing out those reasons in the 2007 amendments (keeping intact the BOP Director's catch-all authority), *see* U.S.S.G. § 1B1.13, cmt. n.1(A) (2007), the Commission left the policy statement largely unchanged until 2016. That year, it "conducted an in-depth review" of compassionate release, in response to sharp criticism by the Office of Inspector General about BOP's "low approval rates" and inadequate "implementation of its compassionate release program." U.S.S.G. Appx. C, Amend. 799; see *United States v. Brooker*, 976 F.3d 228, 231–32 (2d Cir. 2020) (describing criticism). As part of its searching review, the Commission heard testimony from witnesses and experts about the need to remove the hurdles that limit compassionate release for worthy inmates. U.S.S.G. Appx. C, Amend. 799. In the end, the Commission did precisely that, issuing a new policy that "broadens" the eligibility criteria and "encourages" the BOP Director to initiate motions using the new standard as its guide. *Id.* The new definition – which loosened the criteria for terminal illness, swept in more medical impairments, introduced an additional age category, and made family reasons less restrictive – carried over to the current version of § 1B1.13 with virtually no change. *See* U.S.S.G. Appx. C, Amend. 813.

Section 1B1.13's goals of expanding compassionate release and crystalizing guidance means the policy statement is well-suited for use after the First Step Act, which similarly sought to "increase[e] the use and transparency of compassionate release." Pub. L. No. 115-391 § 603(b), December 21, 2018. That the Commission "made a direct plea to the BOP" to ramp up compassionate release engenders confidence that its policy was meant

7

to be as clear and comprehensive as possible. *Bryant*, 996 F.3d at 1250. Although the BOP did not file as many motions after 2016 as Congress hoped, *see United States v. Jones*, 980 F.3d 1098, 1104 (6th Cir. 2020) (describing frustration with BOP's "conservative approach"), Congress did not believe the problem sprang from the eligibility standards. Instead, Congress criticized the BOP for "not fulfilling its role" to file motions on behalf of inmates, while in the same breath *endorsing* the Commission's "authority to determine the conditions by which an individual in federal prison could be released[.]" Letter from 12 U.S. Senators to Deputy Attorney General and Acting BOP Director (August 3, 2017). Afterwards, "in the knowledge that 1B1.13 was the 'applicable' policy statement," *Bryant*, at 1259, Congress passed the First Step Act to change only *who* could file for compassionate release, not *what* made inmates eligible for it. See Pub. L. No. 115-391 § 603(b).

*Second*, abandoning § 1B1.13 risks reverting federal sentencing back to an era of indeterminate sentencing that was broadly repudiated by the Sentencing Reform Act in 1984. For nearly a century, rehabilitation was the primary objective of sentencing – to that end, district courts exercised "nearly unfettered discretion" to choose a sentence while parole officers had "almost absolute discretion" to decide when an offender should be released. *Mistretta*, 488 U.S. at 363-65. The system was ultimately regarded as a failure because it produced two "unjustified" and "shameful" consequences. *Id.* at 366 (quoting S. Rep. No. 98-225 at 38 and 65 (1983)). The first was "the great variation among sentences imposed by different judges upon similarly situated offenders." *Id.* The second was that nobody could be certain "as to the time the offender would spend in prison." *Id.* "Each was a serious impediment to an evenhanded and effective operation of the criminal justice system." *Id.* These outcomes were also viewed as contributing to growing prison unrest and unjustifiably lenient treatment of serious offenders during a period of rising crime. K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 30–31 (1998).

Against this backdrop, Congress passed the Sentencing Reform Act to abolish the parole system, create the Sentencing Commission, and generally "channel[] judges' discretion" in matters relating to sentencing. *Tapia v. United States*, 564 U.S. 319, 325

(2011). In so doing, Congress aspired to "develop a system of sentencing whereby the offender, the victim, and society all know the prison release date at the time of the initial sentencing by the court, subject to minor adjustments based on prison behavior called 'good time.'" S. Rep. No. 98-225 at 46 (1983). It sought nothing less than to create a "fair" system for both offenders and the public, to "retain the confidence of American society," and to ensure "an effective deterrent against crime." *Id.* at 49–50.

The Court's discretion should account for this history – not least because the Sentencing Reform Act enacted the modern compassionate release statute in 18 U.S.C. § 3582(c)(1)(A). Pub. L. No. 98-473, October 12, 1984. Compassionate release was not meant to preserve parole, nor was the First Step Act passed to resuscitate it.[2] Because § 1B1.13 continues to be an appropriate framework for determining release eligibility, the Court should "channel" its discretion through it. Otherwise, compassionate release "would return us to the pre-SRA world of disparity and uncertainty." *Bryant*, 996 F.3d at 1257.

*Third*, hewing close to the existing policy statement is the soundest way to bridge the gap until the Guidelines Manual is updated. Resort to § 1B1.13 has proved appropriate during the coronavirus pandemic. Applying its criteria, judges in this district have properly

---

[2] Not all courts agree. The United States is aware of one court that announced "its role in deciding compassionate release motions . . . is analogous to that traditionally exercised by a parole board." *United States v. Bass*, No. 97CR80235 (E.D.M.I. February 8, 2021) (Dkt. No. 1138) (Notice and Clarification). That court has granted 28 of the 29 of the compassionate release motions it decided on the merits, including one filed by a 51-year-old defendant serving concurrent mandatory life sentences for murdering two people and setting another victim on fire. *United States v. Bass*, Appeal No. 21-1094 (6th Cir. January 29, 2021) (Dkt. No. 5) (Emergency Motion for Stay). A different defendant released by that court has already been rearrested for attempting to murder a woman and her mother. *Id.* This cannot be what Congress envisioned for compassionate release when it passed the First Step Act. It certainly was not what Congress wanted when it enacted § 3582(c)(1)(A) in 1984 – when one committee member responsible for the legislation hoped: "No longer will the victim of a crime, who heard the judge give a stiff sentence to his assailant, have the shock of meeting the offender on the street just a few years later because of his early release on parole. A victim will at least know at the time of sentencing how long an offender will have to serve." S. Rep. No. 98-225 at 794 (1983) (additional views of Sen. East).

9

released scores of prisoners vulnerable to COVID-19 illness, while appropriately denying release to many others who are not as vulnerable. For a motion that does not assert any grounds covered by the policy statement, this Court retains "full discretion" to decide that it simply does not rise to such a "rare" occasion that it would meet the exacting bar established by Congress in § 3582(c)(1)(A). *Jones*, 980 F.3d at 1109; *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). After all, "extraordinary" means "*exceptional* to a very marked extent," and "compelling" means "to cause to do or occur by *overwhelming* pressure." Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphases added). "Put another way, the district court must find that the defendant's situation constitutes the type of 'extreme hardship' that the compassionate-release statute is designed to ameliorate." *United States v. Saccoccia*, __ F.4th __, 2021 WL 3660814 at *2 (1st Cir. August 18, 2021). Few cases actually meet this standard. By incorporating years of research, consultation, and policymaking expertise, the Sentencing Commission has developed criteria that guides the Court's application of this standard, consistent with Congress' directive to "provid[e] certainty and fairness in sentencing" and "reduc[e] unwarranted sentence disparities." 28 U.S.C. § 994(f). If the policy statement does not cover the reason, it is unlikely "extraordinary and compelling."

*Finally*, finality is "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989). While the principle of finality must give way when truly "extraordinary and compelling" cases arise, unguided releases threaten finality in ways that are harmful to society and the offender. Society's goal of deterring crime "depends upon the expectation that one violating the law will swiftly and *certainly* become subject to punishment[.]" *Engle v. Isaac*, 456 U.S. 107, 127 n.32 (1982) (emphasis added; internal quotations omitted). Rehabilitation "demands that the convicted defendant realize that he is justly subject to sanction[.]" *Id.* (internal quotations omitted). Opening compassionate release to any reason shifts the offender's focus away from serving just punishment, and towards the myriad possibilities for how he or she can avoid that service. For this reason as well, the Court's discretion should lean on the factors in § 1B1.13.

B. SEVILLA AVILA does not have the "extraordinary and compelling reasons" required by 18 U.S.C. § 3582(c)(1)(A).

Courts routinely recognize that "compassionate release is 'rare' and 'extraordinary.'" *United States v. Arceo*, No. 9CR616, 2020 WL 2614873 at *2 (N.D. Cal. May 22, 2020); see *United States v. Smeltzer*, No. 18CR4562-JAH, 2020 WL 2797493 at *1 (S.D. Cal. May 29, 2020) ("18 U.S.C. § 3582(c)(1)(A) sets forth a rare exception to the general rule" that courts may not modify final sentence); *United States v. Grady*, No. 15CR204, 2020 WL 4274443 at *1 (E.D. Cal. July 24, 2020) (same). SEVILLA AVILA therefore retains "the burden when making a motion for compassionate release to demonstrate that there are *truly* extraordinary and compelling reasons to change and modify" the final sentence imposed by this Court. *United States v. Bouvier*, 473 F.Supp.3d 205, 206 (W.D.N.Y. 2020) (emphasis added). Because of "the high bar set by Congress and the Sentencing Commission for compassionate release," courts "routinely deny such claims" even during the current national emergency. *United States v. Porter*, No. 12CR643, 2020 WL 4332999 at *4 (D. Oregon July 27, 2020). SEVILLA AVILA fails to meet his high burden.

*First*, SEVILLA AVILA complains that his "serious health problems," including "heart issues, hypertension, and diabetes," warrant immediate release. ECF No. 45 at 9. Not so. As SEVILLA AVILA concedes, these conditions are not new and were presented to the Court "[a]t the time of sentencing." *Id.* Moreover, as this Court and many others by now have concluded, "[h]ealth conditions are not uncommon among people in their sixties, but not every complex of health concerns is sufficient to warrant compassionate release." *United States v. Saccoccia*, __ F.4th __, 2021 WL 3660814 at *3 (1st Cir. August 18, 2021). As such, "[c]hronic conditions . . . that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Pomo*, No. 17CR4360-WQH (S.D. Cal. December 14, 2020) (Dkt. 62); *United States v. Hayden*, No. 11CR393, 2020 WL 4674108 at *2 (D. Oregon August 11, 2020) (same); *United States v. Ballenger*, No. CR16-5535, 2020 WL 3488157 at *5 (W.D. Wash. June 26, 2020) (same); *United States v. Luck*, No. 12CR888, 2020 WL 3050762 at *2 (N.D. Cal. June 8, 2020) (same).

*Second*, SEVILLA AVILA also contends that his health problems warrant immediate release because they put him at a greater risk of serious complications from contracting COVID-19, as evidenced by his hospitalization on September 28, 2021, for a post-COVID heart attack. ECF No. 45 at 10. Again, not so.

As an initial matter, SEVILLA AVILA misinterprets the lab report that he cites in support of his claim that he suffered a post-COVID heart attack. *See* Def. Ex. B at 11. The highlighted language in that lab report (*i.e.* "Consistent with AMI") does <u>not</u> state that *SEVILLA AVILA* experienced an acute myocardial infarction (AMI or "heart attack"). Instead, it reflects that *any patient* whose C-Reactive Protein is 0.6 ng/ML or above is "suggested as being consistent with the WHO criteria for AMI." *Id.* But SEVILLA AVILA's C-Reactive Protein was less than 0.05 ng/ML, which – as indicated in the report – is within the "Normal Range." *Id.* His discharge papers also reflect that he was treated for "Chest Pain (Nonspecific)," not a heart attack. Ex. A. Further, nothing in his medical records suggest that his chest pain was tied to his September 21, 2021, COVID diagnosis, as opposed to his heart issues in general.[3]

Further, the records also do not support SEVILLA AVILA's claim that "GEO delayed" from "promptly helping him" after his COVID diagnosis. ECF No. 45 at 9-10. As his medical records reflect, SEVILLA AVILA was treated by medical personnel at GEO on September 23, 24, 25, 26, and 27 before he was transferred "non-emergently" to Paradise

---

[3] Even if his brief hospitalization for non-specific chest pain was tied to his COVID diagnosis, this Court has recognized that when a defendant "appears to have recovered" from COVID-19 without "serious medical complications," his recovery "diminish[es] the concern that he is a greater risk in developing severe complications." *United States v. Anderson*, No. 10CR2333-MMA (S.D. Cal. October 21, 2020) (Dkt. No. 65). Thus, recovery from COVID-19 is "a fact the Court weighs when considering whether to grant a request for compassionate release." *United States v. Jimenez*, No. 16CR1503-L (S.D. Cal. February 1, 2021) (Dkt. No. 133). Additionally, SEVILLA AVILA's release plan is to go to a halfway house or residential re-entry house. ECF No. 45-1 at 13. Nothing in the record reflects that these housing options will reduce SEVILLA AVILA's risk of contracting COVID-19.

Valley Hospital at approximately 11:14 p.m. on the evening of September 27, 2021. *See* Ex. B. at 6-12; Ex. C at 1.

*Third*, SEVILLA AVILA also contends that his newly experienced "stroke-like symptoms, including a drooping mouth and a tingling sensation in his arm," which resulted in a return to the hospital on October 6, 2021, also warrant his immediate release. ECF No. 45 at 10. Once again, the medical records do not bear out SEVILLA AVILA's claims.

As an initial matter, nothing in his GEO medical records reflect stroke-like symptoms. Instead, the records reflect that, on October 6, 2021, at approximately 3:37 a.m., SEVILLA AVILA complained of chest pain radiating to his arm. Ex. C at 2. He also appeared to be sweating. *Id.* As such, an ambulance was called after medication that was administered failed to eliminate the pain. *Id.*

By 7:27 a.m., he was being released from Paradise Valley Hospital. Ex. D at 1. As with the GEO records, the Paradise Valley Hospital records do not reflect that SEVILLA AVILA had stroke symptoms or was treated for a stroke. Instead, those records reflect that he was seen for "acute chest pain" and "chronic stable angina." *Id.* Additionally, although SEVILLA AVILA now states that doctors at Paradise Valley Hospital determined that "he wasn't getting appropriate care" at GEO, resulting in the doctor having to prescribe "an appropriate medication," ECF No. 45 at 10, nothing in those records reflects such a claim. Instead, the Paradise Valley Hospital physician instructed SEVILLA AVILA to "use your regular medication as directed"; increased the dosage of one of his medications; and added the medication Lipitor, which is indicated for the treatment of high cholesterol.[4] Ex D at 1. Additionally, at 7:40 a.m., the physician attested that he had evaluated SEVILLA AVILA and determined that it was "medically safe to detain and incarcerate" him. *Id.* at 7.

---

[4] *See* https://www.lipitor.com/. To the extent SEVILLA AVILA claims that being prescribed Lipitor by Paradise Valley Hospital reflects substandard care from GEO, the Court should also consider that Paradise Valley Hospital doctors did not prescribe Lipitor to SEVILLA AVILA when he was released from their care less than a week prior.

13

Again, far from SEVILLA AVILA's claim that "GEO is barely caring for him at all," his medical records reflect frequent care and attention by GEO to his medical needs,[5] including his heart issues. For example, upon arrival back at GEO after his October 6, 2021, visit to the emergency room, SEVILLA AVILA was seen that same day by a nurse, Ex. B at 4, and also a physician for "post-hospital" follow-up.[6] *Id.* at 3. At that time, SEVILLA AVILA reported that he "feels better and denies any chest pain." *Id.* The medical records also reflect frequent care and attention specifically to SEVILLA AVILA's heart issues, including being approved to take lexiscan, a prescription drug used to perform a stress test on patients who are unable to exercise adequately for a stress test,[7] and being fitted with a holter monitor that continuously monitored his heart from September 3, 2021, to September 18, 2021. *Id.*

As such, no evidence shows that SEVILLA AVILA has "a serious physical or medical condition" that "substantially diminishes" his ability to "provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover," U.S.S.G. § 1B1.13, cmt. n.1(A)(ii), or otherwise has "extraordinary and compelling reasons" demanding immediate release. Indeed, less than two weeks ago, a Paradise Valley Hospital physician attested that he had evaluated SEVILLA AVILA and determined that it was "medically safe to detain and incarcerate" him. Ex. D at 7. The Court should avoid substituting its view over the opinion of this third-party medical professional and, as such, find that SEVILLA AVILA has not met the "demanding standard for compassionate release." *United States v. Edison*, No. 12-225, 2020 WL 3871447 at *3 (D. Minn. July 9, 2020).

---

[5] The medical attention that SEVILLA AVILA received by GEO on October 6, 2021, was not unusual. Indeed, SEVILLA AVILA's medical records reflect that he has regularly been seen by medical staff since arriving at GEO. *See generally* Ex. B.

[6] The medical attention that SEVILLA AVILA received on October 6, 2021, was not unusual. Indeed, SEVILLA AVILA's medical records reflect that he has regularly been seen by medical staff since arriving at GEO. See generally Ex. D.

[7] *See* https://www.lexiscan.com.

14

**II. The factors under 18 U.S.C. § 3553(a) also do not support release.**

In addition, this Court must consider the 18 U.S.C. § 3553(a) factors in deciding whether a reduction in sentence is warranted. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). The § 3553(a) factors were analyzed by the Court less than three months ago when SEVILLA AVILA was sentenced to 10 months in custody. The Court should decline to find that those factors have changed on account of SEVILLA AVILA's recent recovery from COVID-19 or hospital visits for long-standing health conditions.

## Conclusion

For these reasons, this Court should deny SEVILLA AVILA's motion requesting immediate release.

DATED: October 19, 2021        Respectfully submitted,

RANDY S. GROSSMAN
Acting United States Attorney

*/s/ Shauna R. Prewitt*
SHAUNA R. PREWITT
Assistant U.S. Attorney